**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0321-24

STATE OF NEW JERSEY,

     Plaintiff-Respondent,

v.

LATONIA E. BELLAMY,
a/k/a NA-NA, LATONIA
ELIZABETH BELLAMY,
and LATONIA BELLAMY,

     Defendant-Appellant.

_____

Argued April 28, 2026 – Decided May 13, 2026

Before Judges Gilson, Firko, and Perez Friscia.

On appeal from the Superior Court of New Jersey, Law Division, Hudson County, Indictment No. 11-03-0348.

Joseph J. Russo, Assistant Public Defender, argued the cause for appellant (Jennifer N. Sellitti, Public Defender, attorney; Joseph J. Russo and Claude C. Heffron, First Assistant Deputy Public Defender, of counsel and on the briefs).

Colleen Kristan Signorelli, Assistant Prosecutor, argued the cause for respondent (Wayne Mello, Hudson

County Prosecutor, attorney; Colleen Kristan Signorelli, on the briefs).

Jennifer B. Condon argued the cause for amici curiae Roderick & Solange MacArthur Justice Center (Seton Hall University School of Law Center for Social Justice, attorneys; Jennifer B. Condon, on the brief).

Laura Cohen argued the cause for amicus curiae Rutgers Criminal and Youth Justice Clinic and American Civil Liberties Union of New Jersey Foundation (Rutgers Criminal and Youth Justice Clinic, American Civil Liberties Union of New Jersey Foundation, and Lowenstein Sandler LLP, attorneys; Laura Cohen, Jeanne LoCicero, Ezra D. Rosenberg, and Alexander Shalom, on the brief).

Fox Rothschild LLP, attorneys for amicus curiae Association of Criminal Defense Lawyers of New Jersey (Marissa Koblitz Kingman, of counsel and on the brief; Jenna M. Leanza, on the brief).

PER CURIAM

Defendant Latonia E. Bellamy appeals from the trial court's September 16, 2024 order denying her motion to extend to her, as a young adult criminal offender, the constitutional protections afforded to juveniles when sentenced as adults. She also appeals from the September 27, 2024 amended judgment of conviction and sentence imposed. Having reviewed the record, parties' arguments, and applicable law, we affirm.

I.

This matter returns to us for the third time. We summarize from the record the facts and procedural history relevant on appeal.

After a jury trial, defendant was convicted of the execution-style murders of Nia Haqq and Michael Muchioki in Jersey City. During the early morning hours of April 4, 2010, Haqq and Muchioki returned home after celebrating their engagement at a party with friends and family. After parking and exiting their vehicle, they were met by defendant and co-defendants, Shiquan Bellamy[1] and Darmellia Lawrence (collectively defendants). Shiquan is defendant's cousin.

The victims were on the sidewalk near their vehicle when Shiquan ordered them to lie on the ground and "give him everything." The victims complied and were lying face down on the ground next to each other when Shiquan fatally shot Muchioki "in the head" using a shotgun.

Defendant had carried in her "jacket pocket" a loaded handgun that she obtained from Shiquan earlier in the evening, after telling him and Lawrence she "wanted to shoot a gun." She had known Shiquan possessed multiple firearms. Before the shootings, defendants went to Charmain Piniero's ("Cee-Cee")

---

[1] We use Shiquan's first name because he shares the same surname as defendant.

 A-0321-24

apartment, where Shiquan retrieved the shotgun and handgun, which he gave defendant.

As Haqq lay beside her fiancé on the ground following his fatal shooting, Shiquan directed defendant to shoot the handgun. Defendant "shot twice towards the ground" in the "direction" of Haqq. Because the shots did not immediately kill Haqq, Shiquan "took the gun from [defendant] and shot [Haqq] in the head." At trial, the medical examiner opined Haqq's cause of death was from the gunshot wounds to her head and "left thigh." The leg wound was believed to be the first gunshot injury.

Immediately after the shooting, defendant entered "the front seat" of the victims' vehicle, which was undrivable because of a "lock on the steering wheel." Defendants ran away from the scene to Cee-Cee's apartment. Shiquan gave defendant money stolen from the victims and discarded the personal contents from their stolen wallets. Defendant allegedly had consumed a cocktail and taken an "E[cstasy]-pill" before the murders.

At the time, defendant was nineteen years old and studying psychology in college. Shiquan was a few months older than defendant. She had no criminal history and had endured a difficult childhood, having been in the Division of

4

Child Protection and Permanency's (Division) custody and care for an extended time.

During the investigation, the Jersey City Police Department and Hudson County Prosecutor's Office (HCPO) learned of defendant's participation in the murders. After she was contacted by HCPO detectives, defendant provided a sworn statement on April 9, 2010. Defendant admitted to possessing the handgun, shooting in Haqq's direction after Shiquan shot Muchioki in the head, taking the victims' money, and attempting to steal the car.

The jury found defendant guilty of first-degree felony murder during a carjacking (Muchioki), N.J.S.A. 2C:11-3(a)(3) (count eighteen); first-degree carjacking (Muchioki), N.J.S.A. 2C:15-2 (count nineteen); first-degree felony murder during an armed robbery (Muchioki), N.J.S.A. 2C:11-3(a)(3) (count twenty); first-degree armed robbery (Muchioki), N.J.S.A. 2C:15-1 (count twenty-one); second-degree possession of a weapon (handgun) for an unlawful purpose (Muchioki), N.J.S.A. 2C:39-4(a) (count twenty-three); first-degree murder (Haqq), N.J.S.A. 2C:11-3(a)(1) and (2) (count twenty-four); first-degree felony murder during a carjacking (Haqq), 2C:11-3(a)(3) (count twenty-five); first-degree carjacking (Haqq), 2C:15-2 (count twenty-six); first-degree felony murder during an armed robbery (Haqq), 2C:11-3(a)(3) (count twenty-seven);

5

first-degree armed robbery (Haqq), N.J.S.A. 2C:15-1 (count twenty-eight); second-degree possession of a handgun for an unlawful purpose, N.J.S.A. 2C:39-4(a) (Haqq) (count thirty); and second-degree unlawful possession of a handgun without a permit, N.J.S.A. 2C:39-5(b) (count thirty-two). Defendant was found not guilty of charges related to Muchioki's murder (count seventeen) and a related weapons offense (count twenty-two).

On direct appeal, we affirmed defendant's convictions but remanded for resentencing. State v. Bellamy (Bellamy I), No. A-3676-12 (App. Div. Nov. 8, 2017) (slip op. at 2). We concluded the court had found aggravating factor one, N.J.S.A. 2C:44-1(a)(1) (the nature and circumstances of the offense), based on "double counting" with reasons stated for finding aggravating factor three, N.J.S.A. 2C:44-1(a)(3) (risk of reoffending). Id. at 24. Further, we directed on remand that the court address mitigating factor eight, N.J.S.A. 2C:44-1(b)(8) (defendant's conduct was the result of circumstances unlikely to recur), which defendant had requested. Id. at 25. We specifically noted the court's application of aggravating factors one and nine and mitigating factor seven were sufficiently supported by "the record" and the "reasoning" provided. Ibid.

After the remand, defendant filed a motion to compel disclosure of the records maintained by the Division regarding defendant's custody and abuse

A-0321-24

history. Following argument, on May 30, 2019, the court denied defendant's motion request, reasoning "the records . . . ha[d] no bearing whatsoever factually on the elements of the case." Defendant thereafter moved for a stay of resentencing, which the trial court denied.

On September 19, 2019, the court held a resentencing hearing. Defendant had moved for the pre-sentence reports of Lawrence and Shiquan, asserting they were necessary to properly argue disparate sentences. The court denied the motion, finding a lack of similarity between defendants in sentencing. It limited the resentencing hearing in scope "to the applicability of mitigating factor eight," and found it "d[id] not apply."

The court resentenced defendant to serve: life sentences subject to the No Early Release Act (NERA), N.J.S.A. 2C:43-7.2(a), on counts twenty-four, twenty-five, and twenty-seven; ten-year terms of imprisonment subject to five years of parole ineligibility on counts thirty and thirty-two; thirty-year terms of imprisonment subject to thirty years of parole ineligibility on counts eighteen and twenty; and a ten-year term of imprisonment subject to five years of parole ineligibility on count twenty-three. Counts twenty-four, twenty-five, twenty-seven, thirty, and thirty-two were to be served concurrently with each other. Counts eighteen, twenty, and twenty-three were to be served concurrently with

A-0321-24

each other but consecutive to counts twenty-four, twenty-five, twenty-seven, thirty, and thirty-two.

After defendant appealed from the court's denial of the release of her Division records and the sentence imposed, we reversed and remanded for a third sentence proceeding before a different judge (second court). State v. Bellamy (Bellamy II), 468 N.J. Super. 29, 35 (App. Div. 2021). We concluded the second court at defendant's resentencing could consider the Legislature's newly enacted mitigating factor, N.J.S.A. 2C:44-1(b)(14), because it "will be viewing defendant 'as [s]he stands before the court on that day.'" Id. at 44 (quoting State v. Randolph, 210 N.J. 330, 354 (2012)). Regarding the release of defendant's Division records from her childhood, we instructed the second court to review the documents, redact them as necessary, and release the relevant information to defendant. We directed the records' release because defendant "would know little regarding the proceedings surrounding her care and" "to enable her to address th[e] sentence, arguably one of the most important events in her history."

On July 11, 2024, the second court heard argument on defendant's resentencing motion "to extend [the] constitutional protections recognized in Miller [v. Alabama, 567 U.S. 460 (2012)] to emerging adults." Defendant

specifically argued that the juvenile protections elucidated in State v. Comer, 249 N.J. 359 (2022), State v. Zuber, 227 N.J. 422 (2017), and Miller, should be extended "to late adolescents."  Defendant additionally argued the second court should find additional mitigating factors, a new standalone factor regarding her traumatic childhood, the Miller factors are "embedded" in mitigating factor fourteen, and she should be sentenced as a "youthful offender."

Arguing an extension is warranted, defendant maintained the supporting expert reports and accepted science demonstrated "that late adolescents, like juveniles, are [c]onstitutionally different" and should be "entitled to the same protections as juveniles pursuant to the three-prong test in Comer."[2]

---

[2]  In Comer, the Supreme Court recognized the three part-test in determining whether a punishment is cruel and unusual under the Federal and State Constitutions, stating:

> First, does the punishment for the crime conform with contemporary standards of decency?  Second, is the punishment grossly disproportionate to the offense?  Third, does the punishment go beyond what is necessary to accomplish any legitimate penological objective?
>
> [249 N.J. at 411 (quoting Zuber, 227 N.J. at 438).]

Further, defendant requested the second court extend the Miller[3] factors, and she

---

[3] In Miller, the United States Supreme Court outlined instructive considerations for a sentencing court when addressing a juvenile that is subject to a mandatory life sentence without parole, including:

> [1] . . . consideration of his [or her] chronological age and its hallmark features—among them, immaturity, impetuosity, and failure to appreciate risks and consequences.
>
> [2] . . . taking into account the family and home environment that surrounds him [or her]—and from which he [or she] cannot usually extricate himself [or herself]—no matter how brutal or dysfunctional.
>
> [3] . . . the circumstances of the homicide offense, including the extent of his [or her] participation in the conduct and the way familial and peer pressures may have affected him [or her].
>
> [4] . . . [consideration of whether] he [or she] might have been charged and convicted of a lesser offense if not for incompetencies associated with youth—for example, his [or her] inability to deal with police officers or prosecutors (including on a plea agreement) or his [or her] incapacity to assist his [or her] own attorneys.
>
> [5] And finally, . . . [consideration of] the possibility of rehabilitation even when the circumstances most suggest it.
>
> [Zuber, 227 N.J. at 445 (alterations in original) (quoting Miller, 567 U.S. at 477 (citations omitted)).]

10

specifically highlighted factor three. She contended the Miller factors should be considered under the newly created "mitigating factor [fourteen]" and "must still be considered given the undisputed brain science."

Defendant asserted the second court was bound to follow the Federal and State Constitutions and must extend the law while acknowledging no Supreme Court precedent or action by the Legislature. She requested the second court act on "the merits" based on the "full record," notwithstanding our precedential opinion in State v. Jones, 478 N.J. Super. 532 (App. Div. 2024), which held the Supreme Court in Comer limited its decision to juveniles.

In support of extending the juvenile protections to young adult offenders, defendant cited multiple scientific studies. Defendant also relied on the expert opinion of Tarika Daftary-Kapur, Ph.D., which was moved into evidence by consent and titled, "The State of the Science: Late Adolescent Development, Offending, and Desistence." Additionally, defendant relied on the reports of Megan Perrin, Ph.D., a neuropsychologist who evaluated defendant, and Charles J. Most, Psy.D., who had previously evaluated defendant in 2019 before the first resentencing. Defendant argued that the initial life sentence and the consecutive thirty-year sentence made her parole ineligible for almost ninety-four years, which meant she "would be released when she was 114 years old."

11

Defendant argued if the second court declined to "extend Comer . . . [and Zuber,] . . . then at the very least, [it] must conclude that the Miller factors are embedded and institutionalized within mitigating factor [fourteen]." She posited we intended consideration of the Miller factors in Bellamy II because we stated, "a new [court] must at least have the information necessary to assess whether defendant's childhood provides context for her criminal conduct." 468 N.J. Super. at 50. In applying Comer and the Miller factors, defendant requested the second court sentence her to a thirty-year period of imprisonment with a twenty-year period of parole ineligibility.

The Roderick & Solange MacArthur Justice Center, the American Civil Liberties Union of New Jersey, and the Rutgers Criminal and Youth Justice Clinic appeared as amici curiae, arguing in support of defendant's position.

The State opposed the extension of the constitutional protections recognized for juveniles to young adult offenders. The State noted that the Legislature enacted mitigating factor fourteen and did not extend the juvenile protections in the Criminal Code and argued the second court was bound to follow precedent and deny defendant's motion. Further, the State contended that the "brain science," as applied to defendant, may be considered under "mitigating factor [fourteen]." It acknowledged the "science, . . . reports[,] and

12

how they affect this individual defendant [would be] absolutely appropriate for . . . consider[ation] . . . under the . . . sentencing statutes."

On September 16, 2024, the second court held a hearing specifically to address the parties' arguments regarding the applicable aggravating and mitigating factors. Defendant was thirty-three years old at the time and had served fourteen years in prison.

Defendant argued the second court should apply the following mitigating factors: four, N.J.S.A. 2C:44-1(b)(4) (substantial grounds tending to excuse or justify the defendant's conduct); seven, N.J.S.A. 2C:44-1(b)(7) (defendant's lack of criminal history); eight, N.J.S.A. 2C:44-1(b)(8) (defendant's conduct was the result of circumstances unlikely to recur); nine, N.J.S.A. 2C:44-1(b)(9) (character and attitude of the defendant indicate that he or she is unlikely to commit another offense); twelve, N.J.S.A. 2C:44-1(b)(12) (willingness of the defendant to cooperate with law enforcement); thirteen, N.J.S.A. 2C:44-1(b)(13) (conduct of a youthful defendant was substantially influenced by another person more mature than the defendant); and fourteen, N.J.S.A. 2C:44-1(b)(14) (defendant was under [twenty-six] years of age at the time of the commission of the offense). Further, she requested the second court find the "brain science applie[d] to emerging adults" and sentence her as a young adult offender to a

13

thirty-year term of imprisonment with a twenty-year parole ineligibility on the murder and felony murder charges, to be served concurrent with all the remaining charges. Defendant highlighted the State's agreement that mitigating factors seven and fourteen applied.

Defendant sought to establish she was rehabilitated, had matured, had reformed, and was a different person. She provided a video of witnesses' accounts of her character, accomplishments, and traumatic childhood. Regarding her prior history, defendant posited her childhood "[wa]s at the core of" the resentencing. Defendant had endured a childhood with a mother who was addicted to substances and involved with the criminal justice system. She also experienced multiple sexual assaults by different offenders, long-term instability, mental illness, and time in the Division's care. Regarding the implications of her childhood trauma, defendant referenced multiple scientific studies indicating the resulting behavioral dysfunction. Specifically, defendant referenced Dr. Daftary-Kapur's study, "Resentencing of Juvenile Lifers: The Philadelphia Experience," which indicates that "even when those traumas lead to adolescent problems" and the resulting commission of "major serious crimes, those lifers are still at a very low risk of recidivism." Thus, defendant argued, because she established her "childhood bore a major connection to the

commission of the crime," the second court should afford her "traumatic childhood . . . a standalone mitigating factor that . . . merits substantial weight" and is a "backdrop for the subsequent enumerated mitigating factors."

As to mitigating factor seven, defendant highlighted she had no criminal history. Defendant acknowledged having sexual relations with an inmate in prison, resulting in her pregnancy and the birth of her daughter. Defendant gave a cousin custody of her daughter. Defendant argued mitigating factor twelve applied because she cooperated with law enforcement's request that she testify against a corrections officer who sexually assaulted her cellmate.

Regarding mitigating factors four and thirteen, defendant argued that Shiquan and Lawrence exerted "peer influence" over her, emphasizing Shiquan's role in the murders. While acknowledging she had asked to shoot a gun on the night of the murders, defendant maintained she thought they were going to "walk down the street and shoot at things" and "cannot be held vicariously liable for Shiquan's behavior." Defendant asserted mitigating factor fourteen applied because she was nineteen years old at the time of the murders.

Additionally, as to a disparity between her sentence and co-defendants' sentences, defendant highlighted that Lawrence was only sentenced to a "[twenty]-year NERA sentence" compared to defendant's "sentence of life plus

15

[thirty] years" of imprisonment, creating a "differential [of] 76.75 years." Further, defendant argued Shiquan pleaded guilty to multiple other murders and received "[twenty-five]-year sentences on each aggravated manslaughter count to be served concurrently to each other and consecutively to his two life terms."

As part of the resentencing proceedings, the victims' family and friends provided statements to the second court. Muchioki's sister described her continued unrelenting sorrow and pain from the loss of her brother and sister-in-law, recounting that on the night of the murders, she was waiting to greet them after their engagement party as she was ill and unable to attend. After fourteen years, she described having Post Traumatic Stress Disorder (PTSD), depression, and anxiety from the murders. Regarding Muchioki's family, she explained the loss has "really broken [them] all." Haqq's cousin spoke about the devastation and loss the family has endured. He spoke about the trauma and loss from the killing of the soon-to-be newlyweds, including the tragedy of knowing Haqq and Muchioki never had children and grandchildren. Muchioki's niece requested the second court, in considering defendant's alleged traumatic childhood and suffering, recognize she also "had a traumatic childhood because of [defendant's] actions." Further, Muchioki's niece stated defendant should

16

view a life sentence as a "blessing" because defendant is alive while Haqq and Muchioki are dead.

The State argued defendant was convicted by a jury for the "death[s] of two individuals, . . . Haqq" and "Muchioki." The State emphasized it was defendant's choice to participate in the execution of "two helpless people," returning from "their engagement party." Regarding her specific actions, the State recounted that defendant had asked to shoot a gun, did not walk away or leave, carried the loaded handgun, "fired . . . at the ground" toward Haqq and Muchioki, actively participated in the robbery, and committed the carjacking.

As to defendant's disparate sentencing argument, the State emphasized that Lawrence never fired a weapon, pleaded guilty, and testified for the State. Further, the State argued Shiquan's sentence was longer as he has multiple "life sentences." Discussing responsibility, the State argued defendant acknowledged no responsibility for the deaths of Haqq and Muchioki. Reading the initial sentencing transcript, the State emphasized defendant's lack of rehabilitation and her prior statement, "To the prosecutor, there are no hard feelings even though you, and the jury as well, have convicted the wrong person." The State emphasized the second court should reject defendant's motion to apply Comer and Zuber because she was an adult and not a juvenile at the time of the murders.

17

The State requested the court find aggravating factors: one, N.J.S.A. 2C:44-1(a)(1) (nature and circumstances of the offense, and the role of the actor therein, including whether or not it was committed in an especially heinous, cruel, or depraved manner); three, N.J.S.A. 2C:44-1(a)(3) (risk that the defendant will commit another offense); and nine, N.J.S.A. 2C:44-1(a)(9) (the need for deterring the defendant and others). The State also argued for the imposition of consecutive sentences under State v. Yarbough, 100 N.J. 627 (1985), because the "crimes involved separate acts of violence" with "multiple victims," and "[t]he robberies were committed and then the murders happened." Thereafter, the State moved for defendant to receive an aggregate life sentence with a consecutive thirty-year term of imprisonment with a thirty-year period of parole ineligibility, providing detailed reasons in support of the sentence.

After hearing argument, the second court issued an order accompanied by an oral decision. The same day, it issued a cogent and thorough twenty-three-page written decision finding the relevant facts to the sentencing and denying defendant's motion.

The second court fully considered defendant's arguments and recognized "[t]he developmental science is undisputed and has been stipulated to by the

18

State."[4] The second court also acknowledged defendant and amici curiae had presented evidence that young adult offenders are less mature and more susceptible to peer influence than older adults.

The second court denied defendant's request to "extend [the] constitutional protections for juveniles to young adult offenders such as [d]efendant." It specifically determined not to "extend the holdings of Comer, Zuber, and Miller to [d]efendant who was not a juvenile at the time of the offense" because neither the Legislature nor the courts had extended those considerations to the sentences of adults. Regarding the holding in Comer, the second court found that juvenile offenders are entitled to be considered for parole eligibility after serving twenty years in prison for a life sentence, did not apply to defendant as an adult offender. Similarly, it stated the Miller factors were not extended to defendant as an adult.

The second court "consider[ed] the validity of the developmental science regarding the extension" and relevant precedent in finding its role was to "follow the law enacted by the New Jersey Legislature and . . . precedent of the United States Supreme Court and the Supreme Court of New Jersey." The second court

_____

[4] The second court's written decision summarized defendant's articles, studies, and experts' reports on the developmental science and scientific data on young adult offenders, which we incorporate by reference.

explained the cases defendant relied on involved juvenile offenders and the Supreme Court in State v. Ryan, 249 N.J. 581, 586 (2022), recognized that the Legislature established eighteen as the age of adulthood for sentencing. Further, it stated its "role is to interpret the laws, not enact them" and that the "decision is best left to the Legislature who may enact such laws."

In addressing the applicable aggravating factors, the second court found aggravating factor one applied because the victims were executed even though they complied with defendants' robbery and carjacking demands, demonstrating the killings were "especially heinous, cruel, and depraved." Aggravating factor nine was applied with "great weight," because the second court explained there was a general and specific need to deter murders.

Regarding the relevant mitigating factors, the second court found factor four applied and accorded it moderate weight, determining Dr. Perrin established through defendant's administered Adverse Childhood Experiences Questionnaire that defendant suffered severe childhood trauma. Additionally, Dr. Most had diagnosed defendant with "PTSD" accompanied by "dissociative symptoms and depersonalization." Mitigating factor seven was also found, which the second court determined should be given moderate weight because

defendant had no prior criminal history. It further found mitigating factor eight applied as the circumstances were unlikely to recur.

Based on defendant's multiple achievements while incarcerated, the second court found mitigating factor nine applied and accorded it "great weight." It found relevant that defendant had graduated from college, volunteered to help others in prison, and worked in the COVID-19 quarantine unit. Despite defendant's many accomplishments, the second court recognized she was disciplined for violating prison policy for having sexual relations with an inmate, resulting in her daughter being born in 2022. It declined to apply mitigating factor twelve as defendant's willingness to "d[o] the right thing" by testifying in an unrelated "criminal case in federal court" did not sufficiently rise to the level of cooperation with law enforcement needed under the factor.

The second court also found mitigating factor fourteen, giving it "great weight." The second court emphasized that factor fourteen was the Legislature's response to the Miller and Zuber line of cases. However, the second court explained that while her age of nineteen and childhood history were relevant under mitigating factor fourteen, it did not find defendant established Comer, Zuber, and Miller should be extended to young adult offenders. Therefore,

A-0321-24

specific findings under the <u>Miller</u> factors were not required and defendant was not "eligible for a twenty-year parole bar."

After acknowledging the mitigating factors outweighed the aggravating factors, the court sentenced defendant on count eighteen to a term of thirty years in prison with a thirty-year period of parole ineligibility, and on count twenty-one to a concurrent ten-year term of imprisonment. It determined counts nineteen, twenty, and twenty-three merged with count eighteen. Defendant was also sentenced to a forty-year term of imprisonment on count twenty-four subject to NERA, consecutive to count eighteen. The second court sentenced defendant to ten-year terms of imprisonment on counts twenty-six and twenty-eight to run concurrent with count twenty-four. It further sentenced defendant to a five-year term of imprisonment with a forty-two-month period of parole ineligibility on count thirty-two to run concurrent with counts eighteen and twenty-four. The second court merged counts twenty-five, twenty-seven, and thirty with count twenty-four. Pursuant to N.J.S.A. 2C:11-3(b)(1), the second court noted "the lowest sentence for murder is thirty years with a thirty-year parole bar." Thus, defendant's aggregate sentence was seventy years in prison, with sixty-four years of parole ineligibility.

In considering whether to order consecutive sentences, the second court analyzed and applied the factors outlined in Yarbough. The second court considered defendant's sentence anew and "defendant as the person she [stood] before [it]." In ordering consecutive sentences, the second court reasoned the facts supported that "the murders of two victims were independent of each other," there were separate acts of violence during the same incident, and defendant had "fired the gun" at least twice. It also explained there should be no free crimes, and "defendant's actions involved the intentional deaths of two separate victims." The second court further analyzed the "overall fairness" of the sentence, acknowledging defendant's "achievements while incarcerated" and her "upbringing and [PTSD] diagnosis." However, the second court reasoned defendant was an adult at the time of the crimes and her "actions led to multiple violent acts" resulting "in the loss of . . . two innocent lives." Therefore, the second court found imposing consecutive sentences was "fair and appropriate."

On appeal, defendant raises the following points:

POINT I

THE SENTENCING COURT ERRED IN REFUSING TO APPLY THE MILLER FACTORS. (U.S. Const. amends. VIII, XIV; N.J. Const. art. I ¶ 1, ¶ 12).

A. THE BELLAMY II REMAND ORDER CLEARLY CONTEMPLATES CONSIDERATION

OF THE MILLER FACTORS THROUGH APPLICATION OF MITIGATING FACTOR [FOURTEEN].

B. THE SCIENTIFIC PRINCIPLES THAT REQUIRE CONSIDERATION OF THE MILLER FACTORS FOR JUVENILES APPLY WITH EQUAL FORCE TO [NINETEEN]-YEAR-OLD [DEFENDANT].

C. THE CONSTITUTIONAL PRINCIPLES THAT REQUIRE CONSIDERATION OF THE MILLER FACTORS WHEN SENTENCING JUVENILES TO LENGTHY TERMS APPLY HERE, MAKING THIS ERROR ONE OF CONSTITUTIONAL MAGNITUDE.

D. FUNDAMENTAL FAIRNESS REQUIRES CONSIDERATION OF THE MILLER FACTORS.

POINT II

PROPER CONSIDERATION OF [DEFENDANT'S] YOUTH AT THE TIME OF HER OFFENSE CANNOT RESULT IN A SENTENCE THAT IS THE PRACTICAL EQUIVALENT OF LIFE. (U.S. Const. amends. VIII, XIV; N.J. Const. art. I, ¶ 1, ¶ 12).

A. THE SCIENTIFIC PRINCIPLES THAT THE TRIAL COURT ACCEPTED ARE THE SAME PRINCIPLES THAT THE ZUBER COURT RELIED UPON IN CAUTIONING AGAINST THE IMPOSITION OF CONSECUTIVE SENTENCES FOR JUVENILES.

B. THE SENTENCING [COURT] ERRED IN IMPOSING CONSECUTIVE SENTENCES

24

BASED PRIMARILY ON THE CO-DEFENDANT'S CONDUCT, IN DEROGATION OF ESTABLISHED SENTENCING PRINCIPLES.

C. A PROPER OVERALL FAIRNESS ANALYSIS REQUIRED THAT THE SENTENCING COURT JUSTIFY IMPOSING CONSECUTIVE TERMS.

D. THE [SENTENCING COURT] PROVIDED AN INSUFFICIENT STATEMENT OF REASONS JUSTIFYING THE OVERALL LENGTH OF THE SENTENCE.

POINT III

THE SENTENCING COURT ERRED IN FINDING AGGRAVATING FACTOR ONE AND GIVING MITIGATING FACTOR NINE GREAT WEIGHT. (N.J. Const. art. I, ¶ 1).

A. AGGRAVATING FACTOR ONE DOES NOT APPLY TO [DEFENDANT] BECAUSE HER CONDUCT WAS SUBSTANTIALLY INFLUENCED BY HER MORE MATURE COUSIN, WHO WAS HER CO-DEFENDANT.

B. AGGRAVATING FACTOR NINE SHOULD NOT BE GIVEN GREAT WEIGHT SINCE THE ONLY JUSTIFICATION FOR ITS APPLICATION IS GENERAL DETERRENCE AND BECAUSE IT IS INCONSISTENT WITH THIS COURT'S CORRECT FINDING OF MITIGATING FACTOR EIGHT.

POINT IV

THE TRIAL COURT'S FAILURE TO FIND MITIGATING FACTORS [TWELVE] AND [THIRTEEN] WAS CLEARLY ERRONEOUS. (N.J. Const. art. I, ¶ 1).

    A.    DESPITE OVERWHELMING EVIDENCE SUPPORTING MITIGATING FACTOR [TWELVE], THE SENTENCING [COURT] FAILED TO FIND THAT FACTOR ON THE ERRONEOUS BELIEF THAT "DOING THE RIGHT THING" IS NOT SUBSTANTIAL COOPERATION.

    B.    THE COURT FAILED TO FIND MITIGATING FACTOR [THIRTEEN] EVEN THOUGH IT APPLIES AS A MATTER OF LAW AND MUST BE GIVEN GREAT WEIGHT IN LIGHT OF THE ACCEPTED SCIENTIFIC RECORD.

We permitted the Association of Criminal Defense Lawyers – New Jersey, the Roderick & Solange MacArthur Justice Center, Rutgers Criminal and Youth Justice Clinic, and American Civil Liberties Union of New Jersey to appear as amici curiae. The amici curiae argue in support of defendant's requested relief and extending constitutional safeguards to young adult offenders based on the established developmental brain science.

II.

"We use a limited scope of review when considering a court's sentencing determinations on appeal and apply an abuse of discretion standard." State v.

26

R.A.M., 482 N.J. Super. 439, 456 (App. Div. 2025). Generally, appellate courts defer to the sentencing court's factual findings and should not "second-guess" them. State v. Case, 220 N.J. 49, 65 (2014). A trial court's legal interpretations and conclusion are reviewed "de novo and owe[d] no deference." State v. Konecny, 250 N.J. 321, 334 (2022).

Our Supreme Court has stated:

> The appellate court must affirm the sentence unless (1) the sentencing guidelines were violated; (2) the aggravating and mitigating factors found by the sentencing court were not based upon competent and credible evidence in the record; or (3) "the application of the guidelines to the facts of [the] case makes the sentence clearly unreasonable so as to shock the judicial conscience."
>
> [State v. Fuentes, 217 N.J. 57, 70 (2014) (alteration in original) (quoting State v. Roth, 95 N.J. 334, 364-65 (1984)).]

Our Supreme Court in State v. Rivera held that "[o]n resentencing, the court should give due consideration to all credible evidence in the record and all relevant sentencing factors on the day defendant stands before the court." 249 N.J. 285, 303 (2021) (quoting Randolph, 210 N.J. at 330). The Court explained that "defendant and the State are entitled to bring all relevant factors to the [sentencing] court's attention, so long as they are supported by competent and credible evidence," and "the court on resentencing is free to consider defendant's

27

youth at the time of the offense and apply mitigating factor fourteen, which was given immediate effect in all sentencing proceedings on or after October 19, 2020." Id. at 303-04 (citing N.J.S.A. 2C:44-1(b)(14); L. 2020, c. 110).

III.

We first address defendant's contentions that the second court erred in not extending "the constitutional protection that Miller[, Comer, and Zuber] afford[] juveniles" to young adult offenders based on "the undisputed scientific record." Defendant argues the second court "abdicat[ed]" its responsibility by failing to hold that young adult offenders must be provided the same constitutional protections as juveniles based on the "credible record." Further, he contends the second court was required to conduct "the requisite fulsome analysis of all five Miller factors," because the scientific principles require consideration of those factors, and we had "clearly" directed on remand the second court to contemplate the Miller factors at defendant's resentencing. For the reasons that follow, we reject defendant's arguments.

After the second court denied defendant's application to extend juvenile protections to young adult offenders and resentenced defendant on September 16, 2024, the Supreme Court denied certification on November 15, 2024 in Jones, 478 N.J. Super. at 532, certif. denied, 259 N.J. 304, 259 N.J. 314 and 259

N.J. 315 (2024). Relevantly, in <u>Jones</u>, we rejected the defendants' arguments in favor of extending <u>Comer</u> to young adult offenders, expressly holding the Supreme Court's decision "was limited to juvenile offenders tried and convicted of murder in adult court." <u>Id.</u> at 549.

The defendants in <u>Jones</u> had requested resentencing, arguing the <u>Comer</u> sentencing review procedure "should extend to youthful offenders [that were] between the ages of eighteen and twenty when they committed their offenses." <u>Id.</u> at 534-35. They argued the developmental science supported treating young adult offenders similar to juveniles and that the "Supreme Court has relied on scientific articles that explain[] why many youths do not reach maturity until years after they turn eighteen." <u>Id.</u> at 547-48. In holding <u>Comer</u> was limited to juveniles, we concluded the Supreme Court's decision in <u>Ryan</u>, supported the determination that the constitutional protections afforded to juveniles were not extended to young adult offenders. <u>Id.</u> at 550-51.

In <u>Ryan</u>, our Supreme Court had considered a defendant's appeal of a life sentence without parole under New Jersey's persistent offender statute, N.J.S.A. 2C:43-7.1(a). 249 N.J. at 585-86. The defendant in <u>Ryan</u> had argued his first conviction was committed as a juvenile and, therefore, it should not be considered because "<u>Miller</u> and <u>Zuber</u> . . . change[d] the outcome of [the Court's]

constitutional analysis." Id. at 600. The Supreme Court rejected the defendant's argument as he received an "enhanced sentence of life without parole as an adult." Id. at 586. The Court explained that "Miller and Zuber are uniquely concerned with the sentencing of juvenile offenders to lifetime imprisonment or its functional equivalent without the possibility of parole." Id. at 601.

Further, the Court elucidated that it did not "extend Miller's protections to defendants sentenced for crimes committed when those defendants were over the age of eighteen." Id. at 596. In recognizing the Legislature's role in enacting criminal statutes, the Supreme Court stated "the Legislature knows how to establish minimum ages for predicate offenses." Id. at 599; see N.J.S.A. 2A:4A-22(a) (defining a juvenile as an individual "under the age of [eighteen] years"); see also N.J.S.A. 2A:4A-22(b) (defining an adult as "an individual [eighteen] years of age or older"). The Supreme Court stated, "The Legislature has chosen eighteen as the threshold age for adulthood in criminal sentencing. Although this choice may seem arbitrary, 'a line must be drawn,' and '[t]he age of [eighteen] is the point where society draws the line for many purposes between childhood and adulthood.'" Ryan, 249 N.J. at 600 n.10 (first alteration in original).

While there is consensus among developmental scientists that individuals engage in higher risk behavior as their cognitive capacity develops into their early twenties, neither the Legislature nor the Supreme Court has extended constitutional protections to young adult offenders.  As explained in Jones, we recognize "our institutional role as an intermediate appellate court is a limited one" and that "[w]e are bound to follow the precedents of the United States Supreme Court and the Supreme Court of New Jersey."  478 N.J. Super. at 551; see also State v. Lopez, 395 N.J. Super. 98, 108 (App. Div. 2007) (quoting State v. Des Marets, 92 N.J. 62, 64-65 (1983) (providing that regarding "mandatory prison terms[,] . . . [o]ur clear obligation is to give full effect to the legislative intent, whether we agree or not")).

For these reasons, we conclude the second court correctly found that "the holdings of Comer, Zuber, and Miller" should not be extended to defendant, who was an adult at the time she committed the criminal offenses.  Our Supreme Court has "neither explicitly nor implicitly extended" the juvenile constitutional protections "to offenders who [are] between eighteen and twenty years of age when they committed their crimes."  Jones, 478 N.J. Super. at 549.

We next address defendant's argument that the second court erroneously "failed to conduct the requisite fulsome analysis of all five Miller factors,

31

depriving [her] of the full consideration [our] remand required." She maintains the second court's failure to consider the <u>Miller</u> factors resulted in the court's imposition of "the same functional [sentencing] outcome." Thus, defendant maintains that without consideration of the <u>Miller</u> factors, she did not receive the "promise of mitigating factor [fourteen]." We reject defendant's contention that the second court was required to make specific findings on each of the <u>Miller</u> factors. Further, in <u>Bellamy II</u>, we did not direct the second court to making findings on the <u>Miller</u> factors in resentencing defendant.

Regarding the sentence imposed, the second court thoroughly considered and weighed the aggravating and mitigating factors. Notably, while the second court did not explicitly make findings on each of the <u>Miller</u> factors under mitigating factor fourteen, the record demonstrates the second court considered in great detail the supporting facts defendant argued under the <u>Miller</u> factors. Stated another way, the record demonstrates the second court considered all of the facts defendant argued were relevant to the applicable aggravating and mitigating factors. N.J.S.A. 2C:44-1.

Moreover, contrary to defendant's assertions, the record demonstrates the second court focused on defendant's asserted facts related to <u>Miller</u> under mitigating factor fourteen. The second court correctly noted the Supreme Court

"has acknowledged that the new mitigating factor [fourteen] for offenders under twenty-six" years old was directly in "response to [the] Miller[ and Zuber] line of cases." See Rivera, 249 N.J. at 301-02. We, therefore, reject defendant's assertion that the second court gave "superficial treatment under mitigating factor [fourteen]."

Defendant next contends the second court improperly applied the aggravating and mitigating factors. Defendant argues the second court erred in finding aggravating factors one and nine applied, warranting a remand for another resentencing.

Defendant contends aggravating factor one was incorrectly applied because she "did not plan the murders, conspire to commit them, or even know that she would become involved in a robbery and killing." The second court was unpersuaded by defendant's assertions and found aggravating factor one applied because defendant participated in the "heinous, cruel, and depraved" killing of Haqq and Muchioki. The second court's written opinion highlighted that Muchioki and his fiancé, Haqq, were killed on the pavement in front of their home despite having complied with the demands to surrender their belongings during the carjacking and robbery. The victims were killed "execution" style and Haqq was killed "after . . . shots were fired [killing] Muchioki." The second

33

court explained that defendant had carried the loaded handgun in her pocket as she walked around Jersey City with Lawrence and Shiquan before the killings, actively participated in the crimes while the victims were "scared and petrified for their li[ves]," and undeniably shot in the direction of the victims. We discern no reason to disturb the second court's thorough aggravating factor one findings.

Defendant also argues the second court erred in applying aggravating factor nine and affording it great weight. The second court found a need to deter defendant and others. While defendant was committed to rehabilitation, the second court determined it was "far from a position to say that . . . defendant [was] rehabilitated." The second court detailed defendant's efforts and accomplishments, but it also recognized defendant had received an infraction for engaging in sexual relations with an inmate, resulting in her pregnancy and having a child. Specifically, it found a need to deter "those individuals in our society who perpetrate homicides."

While the second court found aggravating factor nine, the second court also determined that mitigating factor eight was factually supported because defendant had "taken responsibility" and was moving "to better herself." It sufficiently "explain[ed] how it reconcile[d] those two findings." Fuentes, 217 N.J. at 81. The second court considered that the general need to deter homicides

existed, as well as the unique circumstances that applied to defendant, which showed the circumstances were unlikely to occur again because of her personal growth. The credible evidence in the record supports the second court's findings.

Defendant further contends the second court erroneously failed to find mitigating factors twelve and thirteen. The second court declined to apply mitigating factor twelve because defendant acted as "a human being" in serving as a witness in a criminal matter, which involved her cellmate who was sexually assaulted. In declining to find "doing the right thing" warranted a finding of cooperation with law enforcement under factor twelve, the second court noted defendant should continue to make such responsible "choices."

Regarding defendant's argument that mitigating factor thirteen was not addressed, the second court, while not explicitly stating the factor did not apply, made related factual findings. It found defendant had "told [Shiquan] she wanted to shoot a gun," took possession of the loaded handgun, "shot at the couple," and "accepted proceeds from the robbery." It was undisputed at sentencing that defendant was nineteen years old and Shiquan was only a few months older. Given the second court's detailed factual recitation and consideration of defendant's arguments, we are satisfied that mitigating factor

35

thirteen was fully considered. "[S]entences can . . . 'be upheld where the sentencing transcript makes it possible to 'readily deduce' the judge's reasoning.'" R.A.M., 482 N.J. Super. at 460 (quoting State v. Vanderee, 476 N.J. Super. 214, 239 (App. Div. 2023)); see also State v. Bieniek, 200 N.J. 601, 609 (2010) (providing that sentencing courts need not "explicitly reject each and every mitigating factor argued by a defendant"). We discern no error in the second court's decision declining to find defendant was not substantially influenced by a more mature person.

Finally, we address defendant's assertion that the second court failed to make appropriate findings under Yarbough and State v. Torres, 246 N.J. 246 (2021). Specifically, defendant argues a fourth sentencing is required because the second court "imposed consecutive sentences primarily based upon the conduct of a co[-]defendant" and failed to consider the overall fairness of the sentence. Defendant's contentions are belied by the record.

In Yarbough, our Supreme Court established criteria that a sentencing court must consider when deciding whether to impose consecutive sentences. 100 N.J. at 643-44. The Supreme Court explained that a sentencing court must evaluate whether:

> (1) there can be no free crimes in a system for which
> the punishment shall fit the crime;

(2) the reasons for imposing either a consecutive or concurrent sentence should be separately stated in the sentencing decision;

(3) some reasons to be considered by the sentencing court should include facts relating to the crimes, including whether or not:

> (a) the crimes and their objectives were predominantly independent of each other;
>
> (b) the crimes involved separate acts of violence or threats of violence;
>
> (c) the crimes were committed at different times or separate places, rather than being committed so closely in time and place as to indicate a single period of aberrant behavior;
>
> (d) any of the crimes involved multiple victims;
>
> (e) the convictions for which the sentences are to be imposed are numerous;

(4) there should be no double counting of aggravating factors; [and]

(5) successive terms for the same offense should not ordinarily be equal to the punishment for the first offense[.]

[Torres, 246 N.J. at 264 (quoting Yarbough, 100 N.J. at 639-43).]

A-0321-24

"The Yarbough factors are qualitative, not quantitative; applying them involves more than merely counting the factors favoring each alternative outcome." State v. Cuff, 239 N.J. 321, 348 (2019) (citing State v. Molina, 168 N.J. 436, 442-43 (2001)); State v. Carey, 168 N.J. 413, 427-28 (2001).

A "sentencing court must explain its decision to impose concurrent or consecutive sentences in a given case." Cuff, 239 N.J. at 348. "When a sentencing court properly evaluates the Yarbough factors in light of the record, the court's decision will not normally be disturbed on appeal." State v. Miller, 205 N.J. 109, 129 (2011). Further, an explanation of the "overall fairness" is necessary "to 'foster[] consistency in . . . sentencing [because] . . . arbitrary or irrational sentencing can be curtailed and, if necessary, corrected through appellate review.'" Torres, 246 N.J. at 272 (alteration in original) (quoting State v. Pierce, 188 N.J. 155, 166-67 (2006)).

In considering the Yarbough factors, the second court found consecutive sentences were appropriate because: "there can be no free crimes"; defendant's crimes were objectively independent of each other; "the offenses were separate acts of violence" as defendant shot the handgun "at minimum, two times right after the other"; although "the offenses occurred in a single period of aberrant behavior," defendant's actions involved separate "intentional deaths"; and

defendant's actions were the catalyst that "led to multiple violent acts which resulted in the death of two victims."  The second court's consecutive sentences and factual findings are supported by credible evidence in the record.

We further conclude the second court made adequate findings regarding the overall fairness of defendant's sentence under Torres.  246 N.J. at 268.  The second court specifically considered defendant as she stood before the court and highlighted her "achievements while incarcerated."  In its sentencing findings, the second court recognized defendant's accomplishments and growth in great detail.  However, in reviewing defendant's sentence, the second court determined "the circumstances of the[] crimes" and "loss of . . . two innocent lives" could not be "overlooked."  It found while she was nineteen years old at the time of the crimes and had PTSD, defendant's "involvement in perpetrating these murders" and the surrounding circumstances could not be ignored.  The credible evidence in the record supports the second court's sentence.

Affirmed.

I hereby certify that the foregoing is
a true copy of the original on file in
my office.

M.C. Harley

Clerk of the Appellate Division

A-0321-24